Memorandum of Decision
David O. was born on September 8, 1974;[2] he is the second of five children born to Rosa S. Prior to late December 1990, he resided in Hartford with his mother and older brother and attended Annie Fisher School in a special education program. The father of the child is Johnny O. who resides in Puerto Rico and who reportedly has had no contact with David since birth; there are three younger half-siblings (a younger half-brother and two younger half-sisters) who are in Puerto Rico in the care of their maternal grandmother.
At approximately six months following his birth, David O. was diagnosed as having cerebral palsy, and he received physical therapy for this condition from age four. At age six, child sustained a head injury which rendered him unconscious and he was hospitalized. The child's developmental milestones are described as having been severely delayed; certain reports indicate that the child's mother has stated David did not talk until he was two years old and could not walk on his own until age four and one-half.[3] According to information submitted, David has been in special education classes for some years and the mother has stated that the child has presented behavioral problems in the home, which increased significantly as he became older.[4] It is also reported that David presented serious behavioral problems in school, including confrontational conduct with staff and peers
It appears that during the fall of 1990, David O. began experiencing increased behavioral difficulties, including oppositional behavior, severe temper outbursts, and extreme aggressiveness. In school, his conduct involved storming out of the classroom, refusing to comply with simple directions, and leaving the school.[5] On December 7, 1990, a social worker with the Annie Fisher School telephonically contacted the Department of Children and Youth Services (DCYS) reporting that David had CT Page 8773 been struck during the course of an argument which his mother had had with her boyfriend, and that David had come to school with his belongings intending not to return home. He indicated he was afraid of his mother's boyfriend and did not wish to relocate with his mother in Puerto Rico. At that point, apparently a service agreement was drawn in order to assist the family and David was returned to his mother's home.[6] On January 16, 1991, there was a physical altercation between David and his mother;[7]
on January 17, 1991, Rosa S. signed a voluntary placement, the child was placed in a Waterbury shelter, and the next day, moved to the Hartford YMCA.[8] Apparently the young man was returned to the mother's home on January 23, 1991. On January 27, 1991, David was observed by the attendants in a passing ambulance to be walking Hartford streets attired in shorts and sneakers; he was picked up and brought to Hartford Hospital where it was found he had severe frostbite and was unable to move his legs. On February 1, 1991, David was placed by DCYS at the State Receiving Home, East Windsor.[9]
David remained at the State Receiving Home until March 15, 1991 when he was transferred to Altobello Psychiatric Hospital for a more thorough diagnostic evaluation and treatment plan; the referral to Altobello on a "fifteen day paper" resulted primarily, it appears, from sexually inappropriate conduct and an assault incident which allegedly occurred on March 10, 1991.[10]
At Altobello, the evaluation resulted in a diagnosis of: an organic personality syndrome, an oppositional defiant disorder, an attention deficit hyperactivity disorder, learning disabilities with possible specific linguistic deficits, cerebral palsy, etc. The April 1, 1991 report of Dr. Rich, the child/adolescent psychiatrist, states that "non-specific neurologic factors with their origin in [David's] cerebral palsy contribute to his various emotional clinical features"; and further, that "[o]bstacles to the patient's current continued development are that he is both chronically neurologically impaired and in adolescence with the characteristic adolescent drives for autonomy and rebellion contributing to a lack of behavioral control except in [a] highly structured situation." Dr. Rich's report additionally concludes: "[i]t is felt that [David O.] does not need chronic hospitalization . . . [r]ather, he needs to be placed at a highly structured residential program in which social supports, clear guidance, opportunities for sublimation of feelings, etc. can all be available in part of the program;" and that David "needs a period of no longer than two months (at Altobello) during which he can become stable and make plans to CT Page 8774 cooperate with and adapt to a long term residential treatment program." Initially it was anticipated that David would be discharged from Altobello to "a structured environment" by May 15, 1991; however, the young man remained at Altobello until July 16, 1991, apparently not having been accepted at certain residential placements.[11]
Prior to David O.'s discharge from Altobello, DCYS filed, on June 12, 1991, an uncared for petition alleging that David O., residing at Altobello Hospital, was an uncared for child in that his home could not provide the specialized care which his physical, emotional and mental condition required; specifically, the petition alleged that the child's need for a supervised structured environment could not be met by his mother at the time and that he had no family resources to care for him, and, that "[o]n 4/1/91, child was diagnosed as needing a long-term residential treatment program."[12]
Upon discharge from Altobello, David went first to the Douglas House, a shelter in New Haven; although that was to be merely a thirty day admission while plans for the child's future were pursued, he remained at the New Haven Shelter until September 9, 1991, when he was transferred to the YMCA shelter in Middletown.[13] David resided at the YMCA shelter before being transferred to the State Receiving Home; according to the State, David's behavior at the shelter was described as "totally inappropriate; instigating and intimidating other residents as well as being threatening and verbally abusive to the staff." As with the shelters, the plan was for David to remain at the Receiving Home until a suitable residential placement could be found.
David remained at the State Receiving Home until April 14, 1992 when he was placed at The Bennington School, Bennington, Vermont. Prior to the placement at Bennington, DCYS had made several referrals to both community-based and residential programs, but the young man was rejected for a number of reasons including his age, behavioral history, and the inability of certain facilities to meet David's needs.
While David was in the Douglas House, and thereafter, he conferred with a number of professionals, including Dr. Andrew L. Miser, a psychologist, to whom a referral on David's behalf had been made by the Office of Protection and Advocacy. Dr. Miser prepared a lengthy and exceedingly CT Page 8775 comprehensive report entitled "Functional Assessment For Community Based Services". In contradistinction to prior recommendations for long-term, structured residential placements, the Miser assessment focused on "identifying community supports for residential living, employment, and recreation" to promote David's growth and development; it included the psychologist's recommendations for "building functional community living and coping skills." Dr. Miser expressed the view that moving David to a community based residence was essential for the young man's achievement of his educational and vocational potential; several residential models were described in Dr. Miser's report: (1) Enhanced foster care (a family foster house with support services including an in-house counselor, a vocational counselor, an academic instructor, and a case manager); (2) Professional roommate model (living in an apartment with a professionally trained individual who would provide life skills training, with the referenced support services) (3) Supervised living arrangement (living with another person requiring similar support services, along with support living staff to provide coaching in a variety of community living skills); and, (4) Group home arrangement (living in a group home setting with four to six other residents all requiring similar support services, with twenty-four hour staffing to be furnished by a private provider or state agency). The Miser proposal recommended that David be given the opportunity to participate in a regular educational setting, and, that an ITP be developed focusing on employment or post-secondary training, residential options, financial planning, etc., all with a view towards the young man's future on, and after, attaining age twenty-one; the proposal also encompassed individualized counseling to enhance David's self-esteem, to develop an improved understanding of his disabilities, to deal with issues relating to his resistance to authority, and to address the young man's relationship with, and hostility towards; his mother. Dr. Miser recommended "a community based living arrangement which would be designed to meet David's individualized needs and which would include the necessary residential supports to provide a structured teaching environment and supervised living experience, as opposed to [i]nstitutional placement in a state residential treatment program", which the psychologist believed might have "long-lasting detrimental effects on David's life."
While David O. was at Douglas House, the court ordered intellectual and educational achievement evaluation was performed by Dr. Suarez. This psychologist found suggestions of CT Page 8776 an organic brain dysfunction, which might be impacting on his intellectual abilities as well as contributing to the young man's behavioral problems. Dr. Suarez concluded that considering the results of his testing, David O. is an adolescent whose intellectual potential is higher than what his academic achievement demonstrates; and, that "possibly his behavior as well as possible organic problems might be interfering with his ability to achieve academically." As to his recommendation for this young man, Dr. Suarez stated: "David is in need of a residential facility that can provide him with special education as well."
On September 27, 1991, on documentation referred to the court upon stipulation, David O. was adjudicated an uncared for child in that he had specialized needs which could not be met in his home; counsel for the respondent/mother objected to, and excepted to, the adjudication.[14] Thereafter, the case was scheduled on several dates for deposition, respondent/mother stating on December 13, 1991 that she wanted a specific placement date before she would agree to a commitment.[15] The court, on more than one occasion, urged DCYS to seek out and consider any programs or placement facilities having community-based components reasonably parallel to the types of alternatives described in the Miser assessment; the concern of this court has been (and was expressed) that the young man, after spending an inordinately protracted period in a structured residential facility would suddenly be discharged (at age twenty-one or otherwise) into the community without adequate transitional preparation, and absent the practical development of necessary independent living skills.[16] At the January 28, 1992 hearing, it was reported that DCYS was not further pursuing, as cost prohibitive, the Brown Sullivan community based proposal, and that certain facilities to which placement referrals had been made had rejected David.[17] Dispositional hearings were scheduled and held on December 13, 1991; January 28, 1992; February 25, 1992, and March 24, 1992. At all of the said hearings, DCYS urged commitment of David O. for eighteen months, and asserted that without a commitment, the Department was inhibited in its efforts to residentially place the young man.[18] And, at all of the assigned dispositional hearings, commitment to the Department was opposed by respondent/mother (through her counsel) and by counsel representing David. At the February 25, 1992 hearing, it was reported that David was to be interviewed at The Bennington School; on March 24, 1992, the court was informed that he had been accepted at Bennington, and wished to attend that CT Page 8777 residential school. The attorney for David requested the appointment of a separate guardian ad litem, which request was granted by the court. Respondent/mother, on March 24, 1992, objected to a commitment of David to DCYS with a plan to place the young man at Bennington; however, all of the parties agreed that David could be placed at Bennington under the voluntary agreement and, as stated, he was so placed from the State Receiving Home.
Following appointment of a separate guardian ad litem, the court advised all parties that a full evidentiary, dispositional hearing would be conducted on April 24, 1992. On that date, documents consisting of several psychological/psychiatric reports, educational assessments, and eligibility regulations for DCYS' Non-Committed Treatment Program were admitted in evidence. Testimony was received from the DCYS Program Supervisor (pertaining primarily to eligibility for, and placement in, the Non-Committed Program), and it was stipulated the testimony of Rosa S. would be a continued request for the voluntary placement of David and the continued seeking of services for the young man from DCYS.[19] On July 30, 1992, the respondent/mother filed a motion to present newly discovered evidence, and on the same date, counsel for the child filed a similar motion, with accompanying memorandum of law, requesting further dispositional proceedings; in response to the aforesaid motions, a hearing was scheduled, and conducted, on August 25, 1992.[20] At the hearing, it was reported (as per the factual statements in Rosa S.'s motion) that an IEP meeting was held on May 26, in Bennington, Vt., and the Hartford Board of Education, in the development of an IEP, agreed to pay for counseling and related services for David; respondent/mother argued that since DCYS is not paying for the young man's counseling, related services or education, but only his room and board, and as the HBOE has indicated its willingness to defray the cost of therapy and related services, David's needs can best be met in "a less restrictive, more rehabilitative setting, closer to home."
During the course of these proceedings, DCYS has sought residential placement for David O., the young man not having been accepted, for various reasons, at a number of such facilities. The Brown and Sullivan proposal urged by counsel for Rosa S., and by P and A., was unacceptable to DCYS for various reasons including the absence of a "track record" with young men of David's age, concern that David was not yet ready for independent living, the availability of other alternatives, and CT Page 8778 the program's high cost. David refuses to return to his mother's home, or to go to Puerto Rico with her; it was the understanding of DCYS, during the course of its involvement with this family, that Rosa S. intended to move to Puerto Rico.[21] It has been represented to the court that the Brown and Sullivan, Inc. alternative remains available; also, that although that alternative has never been specifically discussed with David, the young man has, in the past (at various times between November 1991 and May 1992), expressed a preference for placement in a family-like setting, perhaps in a suitable foster home.
At the dispositional proceedings, respondent/mother and the child's counsel have contended that the court should not commit David O., who will turn eighteen on September 8, 1992, to DCYS pursuant to Section 46b-129(d). As recently as August 25, 1992, at the hearing on requests to present additional evidence, respondent/mother maintained that the young man should be ordered placed in DCYS' Non-Committed Treatment Plan. Both DCYS and the child's guardian ad litem maintain that commitment to DCYS is clearly in the young man's best interest.[22]
At the dispositional hearing conducted on April 24, 1992, a DCYS supervisor testified that within approximately ninety days following David's voluntary placement at the State Receiving Home, DCYS, in accordance with its regulations, filed the uncared for petition.[23] DCYS contends that the circumstances of this case do not satisfy eligibility criteria for assistance to David (and the family) under the agency's Non-Committed Program. Such contention, based on the evidence presented, and this court's review of the Department's Policy Manual, Volume 2, Chapter V, Bulletin #8, Sections 542 and 543 (1/1/86), is not unfounded. As petitioner points out, David came to DCYS on an emergency basis, not on a request from the family to secure treatment for the child; the young man was placed by the agency following incidents of violence involving himself and other members of the household, essentially on an abuse referral. The Section 543 eligibility criteria refer to the "prognosis of a reasonably healthy parent-child relationship" and an expectation that such relationship will continue while the non-committed child is placed outside the home. Here, the circumstances reveal an overtly hostile relationship between David and his mother, the young man at one point threatening violence towards his mother; Rosa S. has stated that she is unable to care for, and control, David, and, that she is unwilling to have him return home. Section 543A.5. of the eligibility criteria states that the CT Page 8779 non-committed program is based on the premise that the "child's need for placement away from the family home is of a temporary nature"; and, that there must be "a reasonable expectation that the child will be able to return . . . home within a two-year period". (Emphasis in original). The eligibility provisions also state that a child who is expected to require placement on a long-term basis (for more than two years) is not eligible for the the program. As David's guardian ad litem has stressed, it appeared unlikely that the placement of David O. would be temporary in nature given the young man's relationship with his mother, and a reasonable uncertainty on the part of DCYS as to whether respondent/mother would continue living in this jurisdiction. If, at this point, the young man left placement upon or after attaining the age of eighteen, it would be his decision alone as to whether to return to his mother's home, or live independently; considering the young man's repeated statements that he does not wish to live with his mother, it does not seem that any placement outside of the family home could be viewed as a temporary one under the Section 543A eligibility criteria. Thus, there existed, and continues to exist, a bona fide question as to whether David meets the eligibility requirements for treatment under the Non-Committed Program.
Aside from the question of meeting the aforesaid eligibility criteria, the court's function in this contested, dispositional proceeding is not to be overlooked; it is to determine which of the alternatives, including a commitment, set forth in Section 46b-129(d) is consistent with the best interest of David O., an adjudicated uncared for/specialized needs child.[24]
The primary consideration at this stage is the best interests of David O.;[25] our Supreme Court has stated that "in matters involving child custody, while the rights, wishes, and desires of the parents must be considered, it is nevertheless the ultimate welfare of the child which must control the decision of the court." In re Kindis Appeal, 162 Conn. 239, 242 (1972).
Respondent/mother contends that the placement of David in a residential facility such as Bennington violates rights guaranteed by federal law. She cites 20 U.S.C. § 1400, et seq., the Individuals With Disabilities Education Act (IDEA), and,29 U.S.C. § 794, the Rehabilitation Act of 1973 (civil rights statutes prohibiting discrimination on the basis of disability). The provisions of IDEA require state and local education agencies to provide a "free appropriate public education" for all "children CT Page 8780 with disabilities." 20 U.S.C. § 1400(c) and 1414(a). The implementing regulations formulated by the United States Department of Education identify the components of a "free appropriate education". The term "least restrictive environment" is referred to in those regulations adopted as 34 C.F.R. § 300.550 through 300.556. Section 300.550 directs the state educational agency to insure that each public agency establishes and implements procedures meeting the requirements of .550 through .556.[26] The provisions of 20 U.S.C. § 1415 establish the remedy with respect to any infringement of the right to a "free appropriate education"; subsection (a) mandates that the "State educational agency, any local educational agency, and any intermediate educational unit which receives [federal funding] shall establish and maintain procedures . . . to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies and units."20 U.S.C. § 1415(b) establishes the procedures for vindicating the federal right of a handicapped child to a free appropriate education, including the entitlements established under Sections 300.550 through .556 of the federal implementing regulations, and expressly refers to, and includes, a child who is a ward of the State. Section 1415(b)(2) mandates that the parents or guardian "shall have an opportunity for an impartial due process hearing which shall be conducted by the state educational agency, or by the local educational agency, or intermediate educational unit, as determined by State law or by the State educational agency. . . ." (Emphasis added). Section 1415(c), entitled "Review of local decisions by State educational agency", provides that any person aggrieved by the findings or decision of the local educational agency may appeal to the State educational agency which shall conduct an impartial review of [the local agency's] hearing . . ." Section 1415(e) gives an aggrieved party who has exhausted the remedies available under subsections (b) and (c) the right to bring a civil action in a State court of competent jurisdiction, or in the United States District Court.
In the instant case, it is not disputed that David O. is a child with special educational needs and is entitled, under both federal and state law, to all educational services necessary. Connecticut has established a hearing and appeal procedure entirely consonant with the mandates of 20 U.S.C. § 1415
(IDEA). Conn. General Statutes 10-76h. Clearly, if David O., his mother, or DCYS is dissatisfied with the educational plan, remedies exist under the protections afforded by federal and CT Page 8781 state law; but, as 20 U.S.C. § 1415 elucidates, and as petitioner and the guardian ad litem emphasize, the proper avenue through which to raise and resolve such educational issues is the administrative procedure established by General Statutes Section10-76h in the State and local Boards of Education, not through Juvenile Court litigation on an uncared for petition.
The Rehabilitation Act, 29 U.S.C. § 794 prohibits discrimination on the basis of disability in the work place or in schools; thus, since virtually all schools and school districts receive some type of federal funding, the Act assures that school age children with disabilities receive an appropriate free education. To be protected under this statute, an "individual with handicaps" must be "otherwise qualified"; a child or student is "otherwise qualified" if she or he is someone IDEA requires the state to provide with a free appropriate public education.34 C.F.R. § 104.3(k)(2). Section 104.36 of the implementing regulations sets up procedural safeguards parallel to those mandated by 20 U.S.C. § 1415 (IDEA): "A recipient that operates a public, elementary or secondary education program shall establish and implement with respect to actions regarding the . . . educational placement of persons who, because of handicap, need, or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardians of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure." As stated heretofore, Connecticut has established such procedural safeguards for vindicating the federal right to a "free appropriate public education" by the enactment of General Statutes Section 10-76h, and, the administrative hearing and appeal remedies created by that state enactment are the proper means of resolving issues relating to educational plans. See: e.g. Davis v. District of Columbia Board of Education,530 F. Sup. 1209, 1213 (D.C. Dist. 1982) ("It is clear that when a parent contends that the public school education offered his or her child is not appropriate, a due process hearing is in order"); Foster v. District of Columbia Board of Education,523 F. Sup. 1142, 1144 (D.C. Dist. 1981) ("The procedural framework is provided primarily by [20 U.S.C. § 1401 et seq.], and incorporated by [29 U.S.C. § 794 et seq.]").
In the instant case, the educational services federally mandated are not at issue; as stated, it is not CT Page 8782 disputed that David is a special education student and entitled to all necessary and appropriate educational services. The Hartford Board of Education is mandated to defray educational expenses of a youngster within its nexus. As brought out at the August 25, 1992 hearing on the presentation of additional evidence, the Hartford Board has cooperated and has agreed to defray the costs of counseling, education, and related services for David; that is, DCYS is not paying for David's counseling, related services or education, but is defraying the expense of the young man's room and board.[27] Dissatisfaction with an educational plan is not to be resolved in a dispositional hearing on an uncared for petition, but, rather, in accordance with the federal enactments relied upon by respondent/mother, through the state procedures mandated by federal law, which in Connecticut are established under General Statutes 10-76h.
Indisputably, state intervention in family matters is only justified when it is in the best interests of the child. In re Juvenile Appeal (83-CD), 189 Conn. 276, 285 (1983; In re Juvenile Appeal (1983-4), 39 Conn. Sup. 490, 493 (1983). General Statutes Section 46b-129 governs petitions for adjudication of uncared/for children and appropriate disposition. After a judicial determination that a child is uncared for, neglected, or dependent, the court has available three possible options from which to choose regarding custody of that child: (1) to commit the child to the commissioner of children and youth services; (2) to vest such child or youth's care and personal custody in a third party until the child reaches the age of eighteen; or (3) to permit the natural parent to retain custody and guardianship of the child with or without protective supervision by DCYS. In re Juvenile Appeal (85-BC), 195 Conn. 344, 353, (1985); In re Cynthia A., 8 Conn. App. 656, 660 (1986).
Both the petitioner and the guardian ad litem maintain that a commitment to DCYS is in the best interests of David O.; both strongly urge the court to enter an order of commitment. David O. will be eighteen years of age in a few days; he refuses to return to his mother's home, and that home clearly cannot meet his special needs. The problematic relationship between the mother and son continues to exist; in a matter of a few days, David O. will have reached majority and with, or without, a commitment, will be entitled to make his own decisions regarding services and placement, such being maintained at that point "by consent of such youth." Section 46b-129(d). Since David's placement is not merely for educational purposes, CT Page 8783 only a portion of the costs thereof is defrayed by the Hartford Board of Education. DCYS is the agency with the statutory responsibility to provide care, treatment, and services to David O. Upon David's attaining majority, on September 8, 1992, the mother's custodial right to her of-age son will no longer exist, and, if committed to DCYS now, prior to attaining majority, DCYS' role in his life, and the agency's continued provision of services for him, will be (as of 9/8/92) "by consent of such youth." As the guardian ad litem stresses, commitment is in the best interest of David O. because it will serve to ensure stability in the placement of the child (or youth, as of 9/8/92), as well as appropriate long range planning and provision for this young man (which hopefully will include, beginning well in advance of his twenty-first birthday, suitable community based, independent living preparation) to age twenty-one.[28] Commitment to DCYS will afford David the opportunity to receive, at his option, continuing educational benefits, independent living training, and related services to age twenty one. Section46b-129(d). The court finds that the petitioner has established, by a fair preponderance of the evidence, that commitment of David O. to DCYS serves, and is in, the young man's best interests.[29]
It is hereby Ordered: that David O. be committed to the care and custody of the Commissioner of the Department of Children and Youth Services for a period not to exceed eighteen (18) months [youth will be 18 years of age on 9-8-92].
MULCAHY, JUDGE